UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>**JAMES WRIGHT,**<br>             **Defendant.** | Crim. No. 21-219 (KM)<br><br>OPINION & ORDER |

This one-count Indictment charges that the defendant, James Wright, knowing that he had previously been convicted of a felony offense, illegally possessed a Taurus .357 magnum revolver and four rounds of ammunition, in violation of 8 U.S.C. § 922(g)(1). Now before the Court is the defendant's motion to suppress the gun and ammunition as products of an unconstitutional seizure of his person on a public street. (DE 28)

On June 23, 2022, the Court convened an evidentiary hearing on the motion to suppress. The government introduced the testimony of one witness, Officer Joseph Fayiah, a patrolman with the Newark Police Department; the defense did not call any witnesses. Both sides introduced exhibits, consisting of police reports, video, and photographic evidence. (A transcript of the hearing has been prepared, and is cited herein as "Tr.") At the close of the hearing, I reserved decision.

The issue is whether Officer Fayiah, at the moment he laid hands on Mr. Wright, possessed reasonable suspicion of criminal activity sufficient to justify an investigative *Terry* stop. Matters quickly escalated thereafter, producing what all agree would constitute probable cause for an arrest. It is the initial stop of Mr. Wright, however, that is at issue.

**A.    Factual Findings**

On October 17, 2021, Officer Fayiah was in a marked police car with his partner, patrolling Newark's fifth precinct. (Tr. 7) The car is equipped with a

computer screen. Fayiah, who has five years of experience, patrols this territory regularly, and in doing so responds to calls involving physical attacks or threatened attacks. He states, he has become adept at reading suspects' "body language." (*Id.* 7–8)

On that date, he received a call from police dispatch, described further below, which stated that there was a person with a gun at the corner of Chancellor Avenue and Leslie Street. There is a liquor store at that location, and the vicinity is known to the officer as a high crime area. (*Id.* 8–9) He noted that in fact his first homicide case arose just one block away. (Tr. 27) Officer Fayiah made particular reference to shootings, a stabbing at a nearby laundromat, and regular incidents of violence in the area. (Tr. 28)

The dispatch call relayed an anonymous telephone tip, which was communicated to Officer Fayiah orally and on his computer screen. (*Id.*) A police incident detail report, reflecting the telephone tip, was offered in evidence by the defense and admitted. (Ex. D1) Within the report is input from the dispatch officer, Ms. Calhoun, who received the call. This input, created when the call was received on October 17, 2020, at 11:06 am, is presumably the source material for the computer notification that dispatch sent out a few minutes later, at 11:10 am. (Ex. D1) According to the report, the tip was as follows:

> MALE CALLER STATED THAT THERE IS A MALE AT THE ABOVE LOCATION [*i.e.,* Chancellor and Leslie] THAT POINTED A GUN AT A TAXI CAB DRIVER. …
> BLACK MALE ON THE CORNER OF THE ABOVE LOCATION/BLACK COAT/BLACK AND RED CAP[]/[1] WITH A BLACK GUN.
> STANDING ON THE CORNER OF A LIQUOR STORE. . .
> NO CALL BACK NUMBER GIVEN.

---

[1] The defense stipulated orally that "CAPE," in the original, was a typo for "CAP." (Tr. 30–31)

2

Officer Fayiah testified that dispatch told him a tipster had reported that a person had pointed a black gun at a taxi driver; that the person was an African-American male; and that the person was wearing a red and black baseball cap and a black coat. (Tr. 13, 30–31) At the hearing, Fayiah recalled that the tip referred to a "black sweater, black shirt, black pants, and black sneakers." (Tr. 13) Based on the actual copy of the dispatch (Ex. D1) and Fayiah's apparent acknowledgement that he had conflated the description in the tip with items he observed later, I reject this elaboration on the description of Wright's clothing.[2]

In keeping with police policy, Officer Fayiah activated his body camera after receiving the dispatch call. At the time, the patrol car was about a three or four minute drive from the location. (Tr. 10)

Officer Fayiah and his partner, who was driving, approached the corner of Chancellor and Leslie in their patrol car. Fayiah saw an individual who fit the tipster's description standing on the sidewalk by the corner liquor store. (Ex. G1 at 2, Tr. 13)[3] Although the police had not then identified him, the defense stipulated that this individual was Mr. Wright. (Tr. 17–18).

As the police car made a U-turn, Wright appeared to have spotted the police car. (Ex. G1 at 2; Tr. 44–45) The car stopped on Chancellor Avenue at the corner, and Officer Fayiah began to get out. Wright turned and began walking away southbound down Leslie Street. (Ex. G3) The record will bear the interpretation that he did so as result of seeing the police, which raised Officer Fayiah's concern.

---

[2] Box 33 of the incident report, admitted in evidence, contains a more detailed description of Wright, including his address, hair and eye color, weight, and so on. This information, Officer Fayiah clarified on cross-examination, was gathered in the course of post-arrest booking. He also seemingly acknowledged that the more elaborate description of the clothing was based on "what [Fayiah] observed Mr. Wright was wearing" (Ex. G1; Tr. 26), which could not have occurred before Fayiah arrived on the scene.

[3] The incident report states that the person appeared to be acting "erratically" and was having a "conversation with unknown individuals." (Ex. G1 at 2) There was, however, no further elaboration at the hearing.

Fayiah stated in his incident report that Wright "started walking nervously (change of demeanor) at a fast pace south bound on Leslie Street." (Ex. G1 at 2, Tr. 14, 44–45) The body cam video only partly bears this out; to be sure, Wright turned and walked away, but in the video he is walking at a normal pace, not running or fleeing. The meaning of "walking nervously" is not entirely clear.

Fayiah, the video shows, began running to overtake Wright, who continued walking. Fayiah addressed Wright, called out "Yo, excuse me." (Tr. 14; Ex. G3 at approx. 4:40)[4] Fayiah followed Wright and again called out "excuse me," but Wright kept walking with his back to Fayiah and did not respond. (Tr. 36)

Here, the incident report and the hearing testimony diverge. In his incident report, Fayiah sought to justify his stop of Wright, in part, by stating that he had given Wright "verbal commands to stop" but that Wright, who was talking to another person, was "ignoring my commands." (Ex. G1 at 2) On cross examination, Fayiah admitted that this part of the incident report was not accurate; he had called out to Wright but had not actually "commanded" him to do anything. (Tr. 35–36)

Officer Fayiah testified that his intent was to get Wright's attention and have a "conversation" on the subject of the firearm. Wright, however, continued to ignore Fayiah and walk away. (Tr. 15; Ex. G3 at approx. 4:40–4:50)

Fayiah quickly caught up with Wright. He placed his hand on Wright's arm and turned Wright around to face him, placing Wright's back to a wall, saying what sounds like "Yo, stand right here." (Tr. 15, 38–39; Ex. G3 at approx. 4:50) As noted *infra,* the Court finds that this is the moment at which a *Terry* stop occurred. Immediately thereafter there occurred a tussle, in which the two ended up on the ground. *See infra.*

---

[4] At the hearing, the officer recalled saying "Hey you" or Hey yo." The discrepancy is not material.

4

The incident report, however, appears to scramble the time sequence, and again diverges from the video evidence and, eventually, the testimony. According to the incident report, as Fayiah approached Wright, he saw Wright move his right arm across his body and "felt" Wright was reaching for a gun, which is why Fayiah immediately "grabbed" Wright's arm and forcibly detained him:

> As I got closer to the suspect, he brought his right arm in front of his body. At that moment I felt like he was reaching for a gun so I grabbed his arm while fearing the unknown. He pulled his arm away from me so I immediately took him to the ground. As he fell to the ground, I saw a black handle of the gun tucked in the suspect waistband in front of him.

(Ex. G1 at 2) The clear import of the report is that Fayiah grabbed Wright because he saw Wright reaching for a gun, or felt that Wright was reaching for a gun.

That sequencing of events broke down at the hearing. Officer Fayiah's testimony on cross-examination bears quoting at length:

> Q [MR. MCMAHON]. Your report tells a different story. Your report indicates that he, meaning Mr. Wright, while you're getting close to him, he reaches or looks like he's reaching for a gun, right?
>
> A [OFFICER FAYIAH]. Yes, sir.
>
> Q. That's what you wrote in your report, correct?
>
> A. Yes, sir.
>
> Q. But when you looked at the video you saw that never happened, correct?
>
> A. Not true, sir.
>
> Q. You saw before you put your hand on him in the video him reaching for a gun?
>
> A. When we went to the ground his hands were on our hand, sir.
>
> Q. I'm not talking about going to the ground. Okay. What I'm talking about is before you placed your hand upon him, right? Before you placed your hand upon him?

5

A. Yes, sir.

Q. Did you see him reaching for a gun?

A. No, sir.

Q. But you said you did in your report, correct?

A. At some point he did reach, sir. That's what I'm alluding to, sir.

Q. I'm going to read -- I'm looking at your report on the second page, so you can look at it too in fairness.

A. Yes.

. . . .

MR. McMAHON: G 1.

BY MR. McMAHON:

Q. So I'll draw you down to that third paragraph that begins with "as I got closer." Do you see that? Do you see where I'm referring to?

A. Yes, sir.

Q. So you wrote, "As I got closer to the suspect, he brought his right arm in front of his body. At that moment I felt like he was reaching for a gun, so I grabbed his arm while fearing for the unknown." Is that what you wrote?

A. Yes, sir.

Q. That's different than what you told us here today, correct?

[Objection] . . . .

BY MR. McMAHON:

Q. Is that different to you, I felt like he was reaching for a gun as opposed to I saw he was reaching for a gun? Are those different things to you?

A. Sir, I felt -- say that again.

Q. Yeah. Does that mean something different to you, I felt like he was reaching for a gun as opposed to I saw him reaching for a gun?

A. His back was facing me, sir.

Q. What you said to us here today was that you're approaching him, he's not responding to you, so you placed your hand upon him to stop him and turn him, correct?

A. Yes, sir.

Q. That he did nothing prior to that that caused you any concern, correct?

A. There are a lot of concerns, sir.

Q. "He," meaning he, the man?

A. Yes, sir.

Q. Did nothing, moved in any way prior to that that gave you any concern, correct?

A. Prior to that he saw us coming down.

Q. He what?

A. He did make eye contact with us. He saw us.

Q. Okay.

A. He saw the patrol car coming down the hill.

Q. But you agree with me that if someone sees the police coming, they're more than within their rights to walk away from that situation, correct?

A. Sure, sir.

Q. So he did nothing wrong by doing that, correct?

A. Yes, sir.

Q. So going back to what I'm talking about here, when you placed your hand upon him and turned him, prior to that he had done nothing to raise any concern, correct?

A. Sir, when he saw us coming he start moving away, as detailed in the report. And he refused to make contact at this point.

Q. He's walking away, which is within his rights completely, correct?

A. Sure, sir.

7

> Q. You put your hand upon him to turn him because you want to stop him, correct?
>
> A. Yes, sir.
>
> Q. Prior to -- all I'm saying is -- let me make it clear what I'm saying. In your direct here today, you say that after you put your hand on him and turned him and stopped him, he grabbed your right arm and that's what caused you all the concern, correct?
>
> A. Yes, sir.
>
> Q. That's all I'm talking about here. What I'm saying is, prior to, before you put your hand on him and turned him, he had done nothing to raise a concern, correct?
>
> A. Beside fitting the description of a male with a firearm?
>
> Q. Exactly. Besides fitting the description, he had done nothing, correct?
>
> A.     Yes, sir.

(Tr. 43–46)

After much resistance, and frankly some circumlocution, Officer Fayiah admitted that the account in his report—that as Fayiah approached Wright, he seemed to be reaching for a gun, so Fayiah "grabbed" his arm—was wrong. Wright, he admitted, did nothing to cause Fayiah concern *before* Fayiah turned Wright around and placed him against the wall. I find, based on the testimony and video evidence, that certain events proffered to justify the stop—the arm movement as if reaching for a gun, grabbing Fayiah's gun hand—did not occur until after the *Terry* stop.

So, *after* Fayiah forcibly stopped Wright, Wright drew his right arm across his body and grabbed Fayiah's right hand, which is the hand the officer would use to draw his firearm. (Tr. 16–17, 22; Exs. G2 (photo), G3 (video), G4 (slow motion video)) That transformed the character of the encounter—it "changed everything," Fayiah testified—and placed him in fear. (Tr. 22) This testimony I credited, and the officer's subsequent actions are completely understandable, but these facts cannot serve to justify the stop, which preceded them.

8

Fayiah responded forcefully, bringing Wright down to the ground, and the men began wrestling. (Tr. 16–17) At that point, Officer Fayiah actually saw that Wright had a firearm tucked in the front of his pants. Fayiah's partner quickly caught up and assisted in subduing Wright. (Tr. 18; Ex. G3)

The officers handcuffed and arrested Wright, and brought him back to the police station for booking. They recovered the gun and placed it in evidence. The body cam, which had been running the entire time, was turned in and the video recording was uploaded. (Tr. 18–20) That video recording, in real time (Ex. G3) and slow motion (Ex. G4), was played in court.

### B. Legal Discussion

### 1. Standards

All agree that the initial stop of Mr. Wright must be analyzed, not as a full arrest, but as a *Terry* investigative detention. *See Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868 (1968). Under *Terry,* "an officer may, consistent with the Fourth Amendment, conduct a brief investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123, 120 S. Ct. 673 (2000). "Any evidence obtained pursuant to an investigatory stop (also known as a 'Terry stop' or a 'stop and frisk') that does not meet this exception must be suppressed as 'fruit of the poisonous tree.'" *United States v. Brown,* 448 F.3d 239, 244 (3d Cir. 2006) (citing *Wong Sun v. United States*, 371 U.S. 471, 487–88, 83 S. Ct. 407 (1963). The issue, then, is whether the police possessed reasonable suspicion at the time they stopped Mr. Wright. If they did not, then the seizure was invalid, and the gun and ammunition recovered as a result of that seizure must be suppressed.

Reasonable suspicion requires an analysis of the totality of the circumstances, and every case tends to have its own peculiar features. It is nevertheless helpful to set the context by reviewing a few of the more pertinent Supreme Court cases. These may be regarded as adaptations of the "totality of

9

the circumstances" approach articulated, with respect to arrests, in *Illinois v. Gates,* 462 U.S. 213, 103 S. Ct. 2317 (1983).

*Illinois v. Wardlow,* 528 U.S. 119, 120 S. Ct. 673 (2000), did not involve an anonymous tip, but is pertinent to Wright's alleged flight from the police. There, officers were patrolling an area that had been subject to heavy drug trafficking. They observed a man holding a bag. When the man saw the officers, he fled. The United States Supreme Court reversed the grant of a motion to suppress, finding that the characteristics of the area, as well as "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion." 528 U.S. at 124. Chief Justice Rehnquist, writing for the majority, found this principle to be literally proverbial. *Id.* at 129 n.3 (citing Proverbs 28:1 ("The wicked flee when no man pursueth....")). Justice Stevens, writing for four Justices concurring and dissenting in part, nevertheless counseled caution. The degree of suspicion attached to a person's flight, he stressed, depends on the circumstances; it may reflect any number of innocent explanations, including a permissible desire to avoid trouble with the police.

*Florida v. J.L.,* 529 U.S. 266, 120 S. Ct. 1375 (2000), may be regarded as setting a baseline in anonymous-tip cases. There, the police received a telephone tip that a young black male in a plaid shirt was standing at a particular bus stop and was carrying a gun. The police went to the bus stop and saw no further suspicious activity, but saw a young male who fit the description, frisked him, recovered a gun from him, and charged him with unlicensed possession of a firearm by a minor. The Court, per Justice Ginsburg, held that the anonymous tip was not sufficiently reliable to justify a *Terry* stop. The court stressed that such an anonymous tip may gain some credibility if found reliable in its innocent details, but that the crux of the issue is that it be found reliable as to its assertion of illegal conduct:

> An accurate description of a subject's readily observable location and appearance is of course reliable in this limited sense: It will help the police correctly identify the person whom the tipster means to accuse. Such a tip, however, does not show that the tipster has knowledge of concealed criminal activity. The

10

> reasonable suspicion here at issue requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person.

*Id.* at 272. Justice Kennedy, concurring, indicated that the result might be different if the informant placed his or her anonymity at risk, or the informant's credibility could be judged face to face.

*United States v. Arvizu*, 534 U.S. 266, 277, 122 S. Ct. 744, 752 (2002), did not involve an anonymous tip, but is useful for its discussion of the officer's followup investigation of the surrounding circumstances in light of his or her specialized knowledge. *Arvizu* again emphasized the holistic nature of the inquiry, impliedly criticizing the lower court's mechanical counting of factors on a ten-point list. *Id.* at 272. The case involved the stop of a minivan by border patrol agents in Arizona. The minivan triggered a sensor that was used to monitor traffic on a rarely traveled, unpaved road which is commonly used by smugglers to avoid a checkpoint on a parallel, paved highway. It would be unnecessary to take this 40–50 mile trip over "unpaved and primitive" roads, as most destinations would also be accessible by highway. The timing coincided with a shift change, when patrols would not be present. The car slowed down drastically when the border patrol vehicle came into view. The driver stiffened and seemed to be pretending the border patrol agent was not there. The officer noticed that the children in the back had their knees raised as if their feet were propped up by cargo on the floor. As he followed the vehicle, the children simultaneously began waving their arms in an odd and mechanical manner, as if they had been directed to do so, and continued doing so for four or five minutes. The minivan turned away from an area where any family outing would be expected to take place. The officer checked the registration and found the minivan was registered to an address four blocks from the border which was notorious for alien smuggling. The officer pulled the car over and found 128 pounds of marijuana in a duffel bag beneath the feet of the children. The Court, per Chief Justice Rehnquist, upheld the *Terry* reasonable-suspicion stop of the vehicle.

In *Navarette v. California,* 572 U.S. 393, 134 S. Ct. 1683 (2014), an anonymous 911 caller reported that a pickup truck, identified by make and license plate number, had run her vehicle off the road. Highway patrol officers received that report from a dispatcher, spotted the truck, pulled it over, and found 30 pounds of marijuana inside. The Court, per Justice Thomas, upheld the denial of a motion to suppress the drug evidence. Justice Thomas acknowledged that "an anonymous tip *alone* seldom demonstrates the informant's basis of knowledge or veracity." 572 U.S. at 397 (quoting *Alabama v. White*, 496 U.S. 325, 329, 110 S. Ct. 2412 (1990) (emphasis added)). He distinguished *J.L.,* finding that the *J.L.* informant indicated no knowledge of the suspect and had not personally witnessed a crime or even attested to actually seeing the gun. Here, by contrast, the informant stated she had personally been run off the roadway by a vehicle she identified in detail. Such activity, as officers well know, is strongly associated with driving while intoxicated. The circumstances suggested that it was a contemporaneous report of the accident, and Justice Thomas suggested an analogy to a present sense impression, regarded as reliable under the law of hearsay. The 911 system, he noted, permits some tracing of a caller's cell number and location, reducing the concerns associated with total anonymity. The Court held that, although it was a "close case," there were sufficient indicia of reliability to permit a stop of the truck. Justice Scalia, joined by three other justices, dissented.

This sampling of cases suffices, I believe, to give the lay of the land in terms of Supreme Court precedent. With those precedents in mind, I proceed to analyze the facts of this case.

### 2. When the *Terry* stop occurred

Initially, the Court must fix the moment at which the seizure occurred. "A seizure occurs when there is either (a) 'a laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful,' or (b) submission to 'a show of authority.' " *United States v. Lowe*, 791 F.3d 424, 430 (3d Cir. 2015) (quoting *Brown*, 448 F.3d at 245 (quoting *California v.*

*Hodari D.,* 499 U.S. 621, 626, 111 S. Ct. 1547 (1991)). I agree with the defense that a seizure, within the meaning of the Fourth Amendment, occurred at the moment Officer Fayiah put his hands on Mr. Wright to stop his forward progress, turned him face-front, and placed him against the wall, telling him to "stop."5

The government's presentation emphasized Wright's reaching across his body and grabbing of Fayiah's right hand. I have already found factually that this occurred after the officer laid hands on Mr. Wright. The best fallback argument for this approach would be to delay the onset of the *Terry* stop; the government portrays the initial laying on of hands as gentle and non-forcible, perhaps akin to a mere tap on the shoulder to get Wright's attention, and blames Wright for escalating the encounter to a forcible one entailing a seizure. (*See* DE 29, Gov't Brf. at 5–6) It is true that Officer Fayiah did not apply excessive force, or slam Wright against the wall. Nevertheless, it is clear from both the testimony and video evidence that Fayiah did physically stop Wright, turn him around, and place his back against a wall, telling him to stay there. That was clearly a Fourth Amendment seizure. And that, therefore, was the

---

5      Q [Mr. McMahon]. Okay. You place your hand on him, correct?

   A. [Officer Fayiah]. Yes, sir.

   Q. To turn him, correct?

   A. Towards me, sir.

   Q. Okay. But as we see in the video, the way you're turning him his back is to the wall of the building, correct?

   A. Yes, sir.

   Q. Okay. And you accomplish that in order to stop him, correct?

   A. Yes, sir.

*See* Tr. 37–38.

By the same token, however, *Hodari D.* strongly implies that nothing Officer Fayiah did before laying hands on Mr. Wright could have implicated the Fourth Amendment. Absent some physical restraint or submission to authority, there is no seizure.

13

moment at which the police must be found to have possessed a reasonable suspicion of criminal activity sufficient to justify a *Terry* stop.

### 3. Reasonable suspicion for stop

Reasonable suspicion is a fluid concept, dependent upon the totality of the circumstances, with due deference to the specialized knowledge and experience of the police. What is required is that "the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez,* 449 U.S. 411, 417–18, 101 S. Ct. 690 (1981). The courts do allow "officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *United States v. Arvizu*, 534 U.S. 266, 273, 122 S. Ct. 744 (2002).

As to the underlying facts, my findings are stated above. Officer Fayiah's account in the incident report—essentially, that as he approached Wright, he believed he saw Wright reaching for a gun and therefore "grabbed" him—is incorrect, as he admitted. The facts as presented at the hearing, then, represent something of a fallback position.

Be that as it may, the government's proffer of reasonable suspicion, as it emerged from the hearing, would be as follows: The police received an anonymous telephone tip from a male who did not leave a callback number. The tipster stated that there was a man standing at the corner of Chancellor Avenue and Leslie Street, by a corner liquor store. He described the man as a black male, who wore a red and black cap and a black coat, and had a black gun. The man, he said, had pointed a gun at a taxi cab driver, though no further detail was given. Police dispatch immediately relayed the tip to Officer Fayiah and his partner in their patrol car. The officers arrived at the corner within three or four minutes. As they pulled up, they saw a man, now known to be Mr. Wright, an African-American male, who was wearing a red and black cap and black clothing. He was standing near the corner of Chancellor and Leslie, by the liquor store. As the patrol car pulled up to the corner, Wright

14

made eye contact. As Fayiah got out of the car, Wright turned his back and began to walk away down Leslie Street. Fayiah twice called out "excuse me," but Wright continued to turn his back and walk away. Fayiah states that he believed Wright was purposely avoiding him. Fayiah regularly patrolled this area; he knew its general character as a high crime area. Officer Fayiah caught up with Wright, took Wright by the arm, turned him around, placed him against a wall, and told him to stop, with the intention of questioning him about the reported gun.

Anonymous tips have traced a meandering path through Fourth Amendment law. They will be assessed with care, in the context of all the surrounding circumstances. Relevant to this inquiry are the informant's "'veracity,' 'reliability,' and 'basis of knowledge.'" *Alabama v. White,* 496 U.S. 325, 328, 110 S. Ct. 2412 (1990) (quoting *Illinois v. Gates*, 462 U.S. 213, 230, 103 S. Ct. 2317 (1983)). The court cannot simply tick the boxes on a checklist, but must evaluate the totality of the circumstances. The factors traditionally used to evaluate anonymous tips, however, remain a useful guide.  The following five nonexclusive factors, distilled from Supreme Court case law by the Third Circuit, are pertinent to assessing the reliability of an anonymous tip:

> (1) The tip information was relayed from the informant to the officer in a face-to-face interaction such that the officer "had an opportunity to appraise the witness's credibility through observation."
> (2) The person providing the tip can be "held responsible if her allegations turn out to be fabricated."
> (3) The content of the tip is not information that would be available to any observer. . . .
> (4) The person providing the information has recently witnessed the alleged criminal activity.
> (5) The tip predicts what will follow, as this provides police the "means to test the informant's knowledge or credibility."

15

*United States v. Brown,* 448 F.3d 239, 249–50 (3d Cir. 2006) (citations omitted); *accord United States v. McCants,* 952 F.3d 416, 422 (3d Cir.), *cert. denied,* 141 S. Ct. 431 (2020).

The anonymous tip here, considered in light of these factors, is not a strong one.

1. The informant was not confronted face to face; he spoke over the telephone.
2. The informant did not leave a call back number, and there is nothing in the record to indicate that the police could have located him or held him responsible for providing false information.
3. Most of the tip consisted of the physical location and appearance of Wright, facts observable by anyone on the scene. These were innocent details; indeed, even the person's possession of a firearm, without more (such as the person's status as a felon) is not criminal per se.[6] A major weakness in the tip was that the information concerning *criminality* had no corroboration whatever and by its nature could not be corroborated by mere observation of the person. The tip states, with no further elaboration, that the person had pointed a gun at a taxi driver. Time, place, and other particulars of that brandishing incident were not stated. The basis of the tipster's knowledge is unknown. It is impossible to tell from the tip whether the tipster was

---

[6] *See United States v. Nelson,* 284 F.3d 472, 481 (3d Cir. 2002) (citing *United States v. Roberson,* 90 F.3d 75, 79–80 (3d Cir. 1996) ("Under the circumstances, we found that the "anonymous and bare-bones tip" that could have been generated by a caller "looking out his window" was inadequate, despite prevalence of drug dealing in area)). *Nelson,* which upheld a *Terry* stop, is distinguishable on several grounds, including that the informant was known to the police, seemed to possess certain inside information, and was reporting his own victimization by an ongoing crime. *Compare United States v. Lewis,* 672 F.3d 232 (3d Cir. 2012) (tip from a reliable, known informant that individuals in a white Camry with tinted windows were carrying firearms insufficient to establish reasonable suspicion of criminality); *United States v. Ubiles,* 224 F.3d 213 (3d Cir. 2000) (""For all the officers knew, even assuming the reliability of the tip that Ubiles possessed a gun, Ubiles was another celebrant lawfully exercising his right under Virgin Island law to possess a gun in public.").

16

relating what he had recently seen or heard about, or whether he was relating alleged facts about past events. At any rate, no such taxi driver victim was ever located.

4. The tip did not explicitly state whether the information was recent. The tipster seemingly meant that a person of a particular description could be found at the street corner currently. But these, as I say, are innocent facts. No information was given about the alleged threat on a taxi driver; there was no basis to judge whether it was historical, recent, true, or false. In particular, this case does not seem to involve the need to react quickly to halt an ongoing crime, an important factor in some cases. *See Navarette, supra*; *Nelson, supra.*

5. Other than the person's presence on the corner, there was no predictive information indicating insider status or a "special familiarity" that would furnish a basis for the tipster's knowledge of criminal activity. *See, e.g., United States v. Nelson,* 284 F.3d 472, 480 (3d Cir. 2002) (citing *Alabama v. White*, 496 U.S. 325, 332, 110 S. Ct. 2412 (1990)).

Cases finding that a tip has sufficient indicia of reliability generally have involved far more compelling facts.[7]

---

[7] For example, in *United States v. Torres*, 534 F.3d 207, 211–212 (3d Cir. 2008), an automobile stop stemmed from an anonymous telephone tip to an emergency number in which the caller stated, like our tipster here, that a driver had waved a gun at a customer in a gas station. That tip, however, had indicia of reliability not present here. The caller, while a customer at the gas station, actually saw the suspect brandish the gun, described the make of the gun and where he saw it in the vehicle, gave the car's make, model, color, and license number, and described what the victim was doing when assault occurred. The tipster, a taxi driver, gave the name of his cab company and did not attempt to conceal his identity, although he apparently was not asked his name.

*United States v. McCants*, 952 F.3d 416, 422 (3d Cir.), *cert. denied*, 141 S. Ct. 431 (2020), comes closer, but is not to the contrary. That Court, distinguishing *J.L.* and citing *Navarette,* found sufficient indicia of reliability because the caller used the 911 system to report firsthand knowledge of ongoing domestic violence, and she gave an accurate and detailed description of the specific and accurate description of the suspect's location, clothing, and hair that was quickly confirmed by the police. Contrast this case, in which the alleged criminal activity was in the past, not ongoing;

Where, based on the factors cited above, the tip itself may be deemed insufficient, other facts or circumstances known to the police may nevertheless push the facts over the line to reasonable suspicion:

> The following factors have been identified by the Supreme Court and our Court as suggesting suspicious behavior; alone they may be insufficient to establish reasonable suspicion, but if observed by police they can serve to corroborate an otherwise insufficient tip.
>
> (1) Presence of a suspect in a high crime area.
>
> (2) A suspect's presence on a street at a late hour.
>
> (3) A suspect's "nervous, evasive behavior," or flight from police.
>
> (4) A suspect behaves in a way that conforms to police officers' specialized knowledge of criminal activity.

*Brown,* 448 F.3d at 251 (citations omitted).

As noted, the corner in question is located in a high-crime area, and the Officer furnished reasonable grounds for that characterization, based on his regular patrols.[8] I give some weight, then, to neighborhood characteristics, but I note that we do not have the specialized context of, *e.g., Arvizu, supra* (border checkpoints, avoidance of paved roads, etc.).

The hour was near midday, not late at night.

As Officer Fayiah emerged from the police car, Mr. Wright turned his back and walked away. Hailed politely by the officer, he declined to turn around and continued to walk. Officer Fayiah recognized the behavior of someone avoiding the police. As he admitted, however, citizens are not obligated to speak to the police if they do not wish to do so. Simply walking away seems a reasonable way of exercising one's right not to speak to the police. To be sure, flight, hiding, and other suspicious behavior may figure into

---

the informer's basis for knowledge was unknown; the description did not go beyond race and the color of the suspect's cap and coat; and there was no evidence ability to trace the caller through the 911 system.

[8]   The Officer also stated, however, that most of his precinct was a high crime area, an overbroad definition that would tend to throw suspicion on the entire local populace.

the totality of circumstances that may add up to reasonable suspicion. But we have here none of the headlong flight, efforts at concealment, or other suspicious behavior that appear in, *e.g., Wardlow* and other cases. *See also United States v. Valentine,* 232 F.3d 350, 357 (3d Cir. 2000) (distinguishing *J.L.* where anonymous informant gave tip in person, suspects began to walk away at approach of police, and they were in a high-crime area at 1:00 a.m.)). Wright was simply walking and ignoring the officer.

The relevant factors and surrounding circumstances, taken all together, strongly weigh against a finding of reasonable suspicion here. So what are the police, in possession of an insufficiently reliable tip, to do? Under the Constitution they must investigate further:

> Officers proceeding on the basis of an anonymous tip that does not itself give rise to reasonable suspicion have many tools at their disposal to gather additional evidence that could satisfy the requirements of Terry and therefore allow police to stop the individual under appropriate circumstances. . . . These include investigation, surveillance, and even approaching the suspect without a show of authority to pose questions and to make observations about the suspect's conduct and demeanor. . . . Officers' observations during such an inquiry or investigation could create reasonable suspicion necessary to conduct a *Terry* stop. However, reasonable suspicion is always evaluated as of the moment of seizure, and we cannot consider facts that develop after that moment.

*Lowe,* 791 F.3d at 436 (citations omitted).

## CONCLUSION

This case illustrates some basic truisms of criminal procedure. The first is that the exclusionary rule may permit criminal conduct to go unpunished; in suppressing evidence, I am by no means implying innocence in fact—*i.e.,* that Mr. Wright did not have a prior felony conviction or that he did not possess a firearm. The second, related truism is that the law of search and seizure is highly time-dependent; it depends, not only on what the police knew, but *precisely* when they knew it. Here, once the tussle began, Officer Fayiah reacted properly and proportionately, and an arrest was manifestly appropriate

19

based on the facts as they developed. The trouble is that the tussle occurred after the stop, which was insufficiently supported by reasonable suspicion. The third truism is that evidentiary hearings, whether or not strictly required in a particular case, can be both efficacious and revealing. The prosecution cannot be faulted here; it justifiably relied on the police reports. It took a hearing, however, to probe behind search-and-seizure boilerplate and develop the factual context. Those facts require, for the foregoing reasons, that the defendant's motion to suppress evidence be granted.

## ORDER

For the foregoing reasons,

IT IS this 27th day of July, 2022

ORDERED that the defendant's motion to suppress evidence (DE 28), consisting of a firearm and ammunition seized from his person on October 17, 2021, is GRANTED.

/s/ Kevin McNulty
_____
**KEVIN MCNULTY, U.S.D.J.**