UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>**JAMES WRIGHT,**<br>    **Defendant.** | Crim. No. 21-219 (KM)<br><br>**OPINION & ORDER**<br>**ON RECONSIDERATION** |

Before the court is the government's motion for reconsideration (DE 36) of the Court's prior opinion and order (DE 33) suppressing a gun and ammunition seized from the defendant's person in the course of an investigative stop. For the reasons that follow, reconsideration is granted and the motion to suppress is denied.

## I.   BACKGROUND

The Indictment charges that the defendant, James Wright, knowing that he had previously been convicted of a felony offense, illegally possessed a Taurus .357 magnum revolver and four rounds of ammunition, in violation of 8 U.S.C. § 922(g)(1). Mr. Wright moved to suppress the gun and ammunition as products of an unconstitutional seizure of his person. (DE 28) On June 23, 2022, the Court convened an evidentiary hearing on the motion to suppress. The government introduced the testimony of one witness, Officer Joseph Fayiah, a patrolman with the Newark Police Department; the defense did not call any witnesses. Both sides introduced exhibits, consisting of police reports, video, and photographic evidence. (A transcript of the hearing has been prepared. (DE 32))

On July 28, 2022, I filed an Opinion and Order granting the motion to suppress. ("Op.", DE 33; reported at 2022 WL 2967302). Familiarity with that decision is assumed, and I do not repeat my findings and analysis here. In that

1

Opinion I ruled that Officer Fayiah, at the moment he laid hands on Mr. Wright, did not possess reasonable suspicion of criminal activity sufficient to justify an investigative *Terry* stop.

A key piece of evidence at the hearing was an Incident Detail Report in which a police department employee summarized the contents of a telephone tip on October 17, 2020. (Ex. D1) The Court's analysis of the contents of the tip was based entirely on that Incident Detail Report,[1] which reads as follows:

> MALE CALLER STATED THAT THERE IS A MALE AT THE ABOVE LOCATION [*i.e.*, Chancellor and Leslie] THAT POINTED A GUN AT A TAXI CAB DRIVER. ...
>
> BLACK MALE ON THE CORNER OF THE ABOVE LOCATION/BLACK COAT/BLACK AND RED CAP[]/WITH A BLACK GUN.
>
> STANDING ON THE CORNER OF A LIQUOR STORE. . .
>
> NO CALL BACK NUMBER GIVEN.

(Ex. D1)

The government now has moved for reconsideration, seeking to supplement the Incident Detail Report with an audio recording and verbatim transcript of the tipster's telephone call to the police. The defense disputes the appropriateness of accepting this belated evidence, and disputes its relevance, but does not question its authenticity. (*See* Def. Brf. (DE 37).)

---

[1] The sole witness at the hearing, Officer Fayiah, was not the dispatcher and did not take the call. Rather, he was the arresting officer, sent to the scene by the dispatcher. Consequently, when testifying, he knew no more about the contents of the call than was contained in the Incident Detail Report.

This fact, offered to explain a gap in the evidence at the hearing, is not significant to the assessment of reasonable suspicion to stop Mr. Wright. On that issue, it is the collective knowledge of the police, not the subjective knowledge of any particular officer, that is significant. *See United States v. Whitfield,* 634 F.3d 741, 745–46 (3d Cir. 2010) (adopting collective knowledge standard from the context of arrest to that of a reasonable-suspicion stop).

The pertinent portion of the transcript reads as follows:

**October 17, 2020**

**11:03:48am**

911 Operator: 911 whats your emergency

Caller: Ah yes, at Leslie and Chancellor in Newark this guy just pointed a gun at a taxi cab driver um..

911 Operator: Leslie and what the cross street?

Caller: Leslie and Chancellor

911 Operator: Do you have a description of the guy?

Caller: It's a black guy you know he's a black guy — he's just pointed a gun at this taxi cab driver.

911 Operator: Is he still there?

Caller: ah yes, he is on the corner right now at the Liquor Store on Leslie and Chancellor he has a black coat on, black red cap on.

911 Operator: black coat and black red cap

Caller: black gun he just pointed it at a taxi cab driver

911 Operator: he's standing on the corner of the liquor store? Whats the name of the liquor store?

Caller: I don't know the name of the liquor store. It's on Chancellor and Leslie street.

911 Operator: OK we gonna send somebody. Would you like to leave a call back? That's optional.

Caller: ah...no no

911 Operator: ok thank you

**11:04:42am**

Caller: Alright thank you.

**11:09:08am**

911 Operator/Dispatch: I'd ah;517?...

517 Unit: Roger that

> 911 Operator/Dispatch: 18er anything that I might have to pull you off of? I got a 646 [code for suspicious person with a weapon] Chancellor and Leslie?
>
> **11:09:44am**
>
> 517 Unit: (Officers Tanner supposed to be ) (UI) yeah just pull us off this and report back (ui) later
>
> 911 Operator/Dispatch: the time is 11:09  646 Chancellor Ave and Leslie ... had description black male, black coat black and red, let me see, coat with a black gun and black cape .. ah cap
>
> **11:10:15am**
>
> 517 Unit: Roger that ....

(The recording is in the court's file, and a copy of the transcript is attached to this Opinion as an exhibit.)

## II.  DISCUSSION

### A. Reconsideration

The government moves for reconsideration, arguing that the actual recording of the telephone tip undermines the Court's analysis, which was based on the incomplete summary of the call contained in the Incident Detail Report. The defense responds primarily that it is not appropriate, on a motion for reconsideration, to submit evidence that was previously available, and also argues that it does not undermine the report. (*See* Def. Brf., DE 37)

The defense, to be sure, has a point. To require that a party put its best foot forward serves the important goals of judicial efficiency and finality. Thus reconsideration is granted only sparingly. A party seeking reconsideration must generally demonstrate one of the following: "(1) an intervening change in the controlling law; (2) the availability of new evidence that was not available when the court [issued its order]; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice." *Max's Seafood Café ex rel. Lou–Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999) (internal citation omitted); *see also Crisdon v. N.J. Dep't of Educ.*, 464 F. App'x 47, 49 (3d Cir. 2012) ("The purpose of a motion for reconsideration . . . is to correct manifest errors of law or fact or

4

to present newly discovered evidence.") (internal citation omitted). So while motions to reconsider empower a court "to change course when a mistake was made, they do not empower litigants . . . to raise their arguments piece by piece." *United States v. Dupree,* 617 F.3d 724, 732 (3d Cir. 2010) (quoting *Solis v. Current DEV Corp.,* 557 F.3d 772, 780 (7th Cir. 2009)).

The government proffers evidence that is "new," but it is not "newly discovered" in the sense that it was previously unknown or unobtainable. *See Howard Hess Dental Laboratories, Inc. v. Dentsply Intern. Inc.,* 602 F.3d 237, 252 (3d Cir. 2010). The government explains that it did not appreciate the recording's importance until the Court pointed out the gaps or ambiguities in the Incident Report, which, it turns out, is not an adequate proxy for the recorded call itself. The government concedes that it could and should have submitted the recording at the hearing. (DE 36 at 2) I therefore consider the government's motion, not under the category of newly discovered evidence, but under the catchall category of manifest injustice or clear error.

To deny reconsideration where there is a likelihood of error exacts a cost in terms of justice. That is particularly so in relation to the exclusionary rule, which may permit factually guilty persons to go free in order to deter culpable, unconstitutional conduct by the police. *See generally Davis v. United States,* 564 U.S. 229, 249 (2011). An erroneous suppression imposes a high social cost without the offsetting benefit.

What the government is suggesting in this motion is that the police did not err at all, let alone purposely violate anyone's rights. If there was a mistake here, says the government, it was no more than a deficiency (indeed, an inadvertent and fairly understandable one) in the manner that the evidence was presented in court. It would not be just to persist in an erroneous suppression ruling in the name of efficient judicial administration. I will therefore grant the motion to reconsider in the narrow sense, and proceed to consider whether the government's newly-submitted evidence affects my prior decision.

5

### B. The Merits

Much of the Court's reasoning from the prior Opinion is unaffected by the new evidence. I generally adhere to my factual findings as to how the suspect was described, the officers' approach to Wright, and the point at which the *Terry* stop occurred. This newly proffered evidence does, however, undermine three pillars of the Court's reasonable-suspicion analysis: (a) that the call was not a 911 call; (b) that the tipster did not clearly state that he had actually seen the person point a gun at a taxi driver; and (c) that the tipster was not necessarily reporting fresh observations, as opposed to historical or secondhand information.

My focus here, then, is on the portion of the Court's prior opinion which analyzed the reasonable-suspicion basis for the stop. (*See* Op. 14–19, 2022 WL 2967302 at *7–*10) That was a highly fact-sensitive analysis of the reasonableness of police officers' reliance on anonymous tips, which requires the Court to consider the informant's knowledge and veracity. (*See* Op. at 15 (citing *Alabama v. White*, 496 U.S. 325, 328, 110 S. Ct. 2412 (1990) (citing *Illinois v. Gates*, 462 U.S. 213, 230, 103 S. Ct. 2317 (1983)). I concluded that the tip, though corroborated in its innocent details (such as the physical description of Mr. Wright), was not a sufficiently reliable basis for a finding of reasonable suspicion. Critical to that conclusion was the lack of any indication of the basis for the informant's knowledge that Wright had been involved in *criminal* activity.

My analysis consisted of weighing five primary factors and four corroborative factors that the Third Circuit has gleaned from the Supreme Court case law. (Op. at 15–18, 2022 WL 2967302 at *8–10 (citing *United States v. Brown*, 448 F.3d 239, 249–50 (3d Cir. 2006); *United States v. McCants*, 952

F.3d 416, 422 (3d Cir.), *cert. denied*, 141 S. Ct. 431 (2020)).[2] In light of the new evidence, those factors must be reweighed.

It remains true that the informant spoke, not face to face, but over the telephone, and that he did not leave a call back number. It remains true that much of the tip consisted of the physical location and description of Wright, facts which were innocent in and of themselves. It also remains true that the physical descriptions in the tip were accurate, and that the defense raises no issue of misidentification. From there, however, the case takes a different turn.

It is now clear, as it was not before, that the call was a 911 call, commonly understood to be an emergency call. Critically, it is now clear that the tipster was reporting his eyewitness observation of a gun crime that had just occurred at a particular intersection.

---

[2] As noted in the Opinion, the following five nonexclusive factors, distilled from Supreme Court case law by the Third Circuit, are pertinent to assessing the reliability of an anonymous tip:

> (1) The tip information was relayed from the informant to the officer in a face-to-face interaction such that the officer "had an opportunity to appraise the witness's credibility through observation."
>
> (2) The person providing the tip can be "held responsible if her allegations turn out to be fabricated."
>
> (3) The content of the tip is not information that would be available to any observer. . . .
>
> (4) The person providing the information has recently witnessed the alleged criminal activity.
>
> (5) The tip predicts what will follow, as this provides police the "means to test the informant's knowledge or credibility."

The following four factors, while perhaps insufficient to establish reasonable suspicion, may serve to corroborate an otherwise insufficient tip:

> (1) Presence of a suspect in a high crime area.
>
> (2) A suspect's presence on a street at a late hour.
>
> (3) A suspect's "nervous, evasive behavior," or flight from police.
>
> (4) A suspect behaves in a way that conforms to police officers' specialized knowledge of criminal activity.

(Op. at 16–18 (citations omitted))

7

The recording of the call is far more specific than the Incident Report. The caller states that "at Leslie and Chancellor in Newark this guy **just** pointed a gun at a taxi cab driver," conveying both the recency of the incident and its location. In response to the operator's question, the caller gives a brief description, and repeats "he's **just** pointed a gun at this taxi cab driver." The operator seemingly understands this as a fresh report, because she asks "Is he **still there**?" After the operator elicits a more detailed description, the caller repeats "black gun he **just** pointed it at a taxi cab driver." (Call transcript, attached and quoted at pp. 3–4, *supra*; **bold** emphasis added.)

So it is not just the physical appearance and location of the individual (later identified as Wright), but the caller's basis for knowledge of Wright's *criminal activity* that is suggested. Now, the gun is not merely possessed (which, as pointed out in my earlier opinion, would not necessarily be unlawful), but used in a crime. And it is apparent from the wording and its context that the caller is reporting what he is seeing or has just seen.

This evidence also changes the context for Wright's walking away upon spotting the police. In my earlier opinion, I emphasized that a citizen is not required to speak to the police, and might have any number of reasons for declining to do so. By tying Wright and the gun to a recent criminal episode, however, the tip tended to suggest that Wright's walking away from the police was not innocent, but rather a further circumstance contributing to reasonable suspicion. I also give some weight, as I did before, to the officer's well-founded belief that these events occurred in a high-crime area.

In light of these facts, the applicability of certain cases cited in my earlier Opinion must be reassessed. Take, for example, *Navarette v. California*, 572 U.S. 393, 134 S. Ct. 1683 (2014), a case which I distinguished based on the facts as I then understood them. There, an anonymous 911 caller reported that a pickup truck, identified by make and license plate number, had run her vehicle off the road. Highway patrol officers received that report from a dispatcher, spotted the truck, and executed a reasonable-suspicion traffic stop, which yielded drug evidence. Important to Justice Thomas's analysis was that

the circumstances suggested a contemporaneous, fresh report of the accident. His opinion suggested an analogy to the admissibility in evidence of a statement containing a "present sense impression," which undercuts the likelihood of deliberate fabrication. *Cf.* Fed. R. Evid. 803(1). The traffic accident reported by the caller, he noted, was of a type associated with criminality, specifically, driving while intoxicated. He noted as well that federal cellular regulations may enable, if not require, some tracing of 911 calls, such that a caller might not be confident in total anonymity. *See also McCants*, 952 F.3d at 423 ("Although 911 calls are not per se reliable and the police in this case did not identify the caller, the informant's use of the 911 system here adds to the tip's reliability in the same way it did in *Navarette*.").

Our facts read well onto the *Navarette* template. As we now know, this was a 911 call. The circumstances and the repeated wording of the call now suggest strongly that it was a fresh eyewitness report. The conduct observed by the caller was not merely indicative of crime (like erratic driving), but an actual crime (threatening a cab driver with a gun). And the remainder of the *Navarette* tip, like the tip in this case, was an accurate description of facts, otherwise innocent, that permitted rapid identification of the perpetrator.[3]

---

[3] The newly submitted evidence also suggests that our facts are distinguishable from those of *Florida v. J.L.*, 529 U.S. 266, 120 S. Ct. 1375 (2000), for reasons similar to those expressed in *Navarette*. The informant in *J.L.* had not attested to actually seeing the gun, and, even assuming the gun was possessed, had no basis to conclude that such possession was a crime. *See also United States v. Ubiles*, 224 F.3d 213 (3d Cir. 2000) ("'For all the officers knew, even assuming the reliability of the tip that Ubiles possessed a gun, Ubiles was another celebrant lawfully exercising his right under Virgin Island law to possess a gun in public.").

Certain Third Circuit cases cited in my earlier opinion, while not factually on point in every particular, also take on a different hue in light of these new facts. For example, I distinguished *United States v. Torres*, 534 F.3d 207, 211–212 (3d Cir. 2008), because the tipster there had actually just seen a driver wave a gun at a customer in a gas station—a fact which now tends to bolster, not negate, the government's position here. *United States v. McCants*, 952 F.3d 416, 422 (3d Cir.), *cert. denied*, 141 S. Ct. 431 (2020), distinguishing *J.L.* and citing *Navarette*, found sufficient indicia of reliability because the caller used the 911 system to report firsthand knowledge of ongoing domestic violence, and she gave an accurate and

9

In light of the government's newly submitted evidence, I am constrained to conclude that the facts available to the police meet the fairly low threshold of reasonable suspicion. Consequently, the *Terry* stop of Mr. Wright was justified, and the gun and ammunition seized from him should not be suppressed as fruits of an illegal stop.

## ORDER

For the foregoing reasons,

IT IS this 22d day of September, 2022,

ORDERED that the motion for reconsideration (DE 36) is GRANTED; and it is further

ORDERED that the Court's prior Opinion and Order (DE 33) granting suppression of evidence is VACATED; and it is further

ORDERED that the motion to suppress evidence (DE 28), consisting of a Taurus .357 magnum revolver and four rounds of ammunition seized from the defendant on October 17, 2020, is DENIED. .

/s/ Kevin McNulty

**KEVIN MCNULTY, U.S.D.J.**

---

detailed description of the suspect's location, clothing, and hair that was quickly confirmed by the police. I distinguished *McCants* on a number of bases, including (as I then thought) that the alleged criminal activity in our case was in the past, not ongoing, and the informer's basis for knowledge was unknown.